UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MICHAEL SULLIVAN, KENNETH S. SALADIN, ZVI BODIE, ALAN J. MARCUS, KEVIN T. PATTON, LION DEN INC., and DANA LOEWY individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>- against -<br><br>OPENAI FOUNDATION (F/K/A OPENAI INC.), OPENAI GROUP PBC, OPENAI GP, LLC, OPENAI OPCO, LLC, OPENAI GLOBAL, LLC, OAI CORPORATION, OPENAI STARTUP FUND I LP, OPENAI STARTUP FUND GP I LLC, OPENAI STARTUP FUND MANAGEMENT LLC, and MICROSOFT CORPORATION,<br><br>Defendants. | Lead Case No. 1:25-md-03143<br><br>Member Case No. 1:26-cv-6966<br><br>**DECLARATION OF KIM PAWLAK IN SUPPORT OF PLAINTIFFS IN OPPOSITION TO THE ORDER TO SHOW CAUSE TO STAY PENDING RESOLUTION OF SUMMARY JUDGMENT MOTIONS** |

Pursuant to 28 U.S.C. § 1746, I, Kim Pawlak, hereby declare under penalties of perjury under the laws of the United States of America that the following is true and correct:

1. I am the Executive Director of the Textbook & Academic Authors Association ("TAA"), a 501(c)(3) not-for-profit organization that is the only organization devoted solely to supporting authors of textbooks, scholarly journal articles, and academic books, by providing comprehensive resources, events, and networking opportunities, and by advocating on their behalf. I am personally familiar with the facts contained in this declaration and make this declaration in support of the Plaintiffs and the Proposed Subclass's Opposition to the order to show cause to stay pending resolution of summary judgment motions.

2. Contracts between textbook authors and publishers are different from contracts between trade and scholarly authors and publishers. Textbook contracts frequently require

assignment or transfer of copyright to publishers for the convenience of administration, while reserving various-defined author royalty and participation rights. This is different from trade authors, who typically reserve their copyright, have fewer administrative issues necessitating complex commercial arrangements, and often include clauses that expressly state that recoveries from infringement suits will be split 50/50 between authors and publishers.

3. As Executive Director of TAA, I was first consulted in connection with the class settlement in *Bartz et al v. Anthropic*, 4:24-cv-05417-AMO (N.D. Cal.) on or about September 13, 2025, several days after the September 8, 2025 conference at which the court expressed its concern to assure that authors and publishers were placed on an equal playing field in the process for allocating settlement proceeds between them. (*See* Tr. of Sept. 8 proceedings, ECF No. 372, at 15:08–17 ("I would like for you to explain what is going on between the guilds, the publishers. What kind of deal are you trying to do behind the scenes?").)

4. Following that process, TAA worked diligently with Class Counsel to support settlement efforts and to resolve issues concerning the allocation of settlement proceeds between textbook and academic authors on the one hand, and publishers on the other.

5. I personally participated in the "Author-Publisher Working Group" settlement mediation and negotiations that took place between September 13 and the preliminary approval hearing on September 25, 2025 (which I attended in person, given TAA's interest in this settlement, traveling from my home in Wisconsin).

6. TAA was assisted by counsel from Slarskey LLC and Archstone Law Group, David Slarskey and Brenda Ulrich, whose work in support of the class settlement efforts was acknowledged by Class Counsel. (*See* Declaration of Rachel Gelman, ECF No. 505-3, ¶ 45 (noting that Slarskey and Archstone are "two firms experienced in representing authors," and

acknowledging their valuable "work completed in connection with the Author-Publishing Working Group.").)

7. Since the preliminary approval hearing, TAA prepared and distributed materials to its member authors, and conducted webinars designed to raise awareness of the settlement and inform authors how to navigate the process and file a claim. Those webinars were open to all authors as a public service. And we coordinated those efforts with Class Counsel (who have attended webinars we hosted), and incorporated feedback from Class Counsel to assure that we provided accurate and reliable information to authors.

8. For textbook authors in particular—whose works were defined as "educational works" based on the identity of their publishers for purposes of settlement administration—there are additional complexities in the settlement process: whereas trade and academic authors enjoy a presumption that they will share 50/50 in settlement proceeds with their publishers, and may simply claim as much, textbook authors do not enjoy that presumption.

9. Instead, the settlement provides for a "meet-and-confer" process whereby participating authors and participating publishers each state their claim as to their best understanding of what percentage of the proceeds they should receive vis-à-vis the other—if they know—and if they either disagree, or if they do not know what percentage they should receive, there is a process defined for the exchange of information. If no agreement is then reached, the dispute will be submitted to a Special Master. Importantly, if one party claims, and the other party does not claim (and did not opt out), then the claiming party will receive its unopposed claimed percentage of the recovery and may have ultimately receive 100% of the settlement proceeds.

10. During this meet-and-confer process some textbook publishers have been demanding 85% of the recoveries for each work instead of the 50/50 split that trade and academic

authors have been receiving with their respective publishers. The burden on textbook authors to share fairly in the proceeds of this settlement is extreme.

11. There are certain built in economic dynamics associated with this complex structure, insofar as there are far fewer educational work publishers, who each have aggregate interests in a greater number of works than each individual educational work author. The publishers have had (and continue to have) access to far better information and resources than the authors, and can act in a coordinated, strategic fashion across all their titles in an effort to maximize their recovery across their portfolio of works. This is one reason why TAA looked to the court, through a motion to intervene and for curative communication and otherwise, to perform the critical function of closely monitoring communications to class members. Publishers have a strong incentive to take advantage of authors through unfair communications, and it is much easier for them to do so on a wholesale basis.

12. At the preliminary approval hearing, the court acknowledged that this distribution plan "necessarily [wa]s going to have some complications," and that "to manage this process to a successful and an ethical end" required counsel "to bird dog this at every stage and bring to my attention problems when they arise so that we can get together and see how to solve the problems." (Tr. of Sept. 25, 2025 Proceedings, ECF No. 431, at 17:03–16.)

13. On December 12, 2025, I received an email from one of our members, who forwarded an email received from a publisher, containing misleading settlement communications that, among other things, instructed the textbook author on what the publisher believed the textbook author should receive. Because of the publisher's misleading settlement communications, TAA moved to intervene and placed the issue before the court.

14. While TAA supported the settlement in *Bartz*, in large part as a result of its dual-mission to support textbook *and* academic authors (the latter of which also enjoyed the 50% presumption), it has become clear that textbook authors need separate representation to ensure that the allocation of settlement proceeds between textbook authors and publishers is fairly and impartially resolved.

15. Writ large, TAA is concerned about the impact of market substitution, price erosion, and other textbook-market harms on textbook authors. TAA has seen that these unique theories of market harm have not been properly developed in cases with defendants that employ artificial intelligence ("AI"), including *Bartz*. To that end, TAA believes that going forward, textbook authors need their own counsel pre-settlement to develop these unique theories of market harm in cases with defendants that use AI.

I declare under penalty of perjury that the foregoing is true and correct. Executed on September 10, 2026, in Madison, Wisconsin.

Kim Pawlak

Kim Pawlak